**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**DEREK STREETER,
JOSEPH GLOVER,
JOSE COBBS, and
PAUL JOHNSON,**

           **Plaintiffs,**

**v.**　　　　　　　　　　　　　　　　　　**Case No. 3:05cv286/MCR**

**CITY OF PENSACOLA and
PENSACOLA PROFESSIONAL
FIREFIGHTERS LOCAL CHAPTER 707,[1]**

           **Defendants.**

_____/

**O R D E R**

      Plaintiffs Derek Streeter ("Streeter"), Joseph Glover ("Glover"), Jose Cobbs ("Cobbs"), and Paul Johnson ("Johnson")  (together, "plaintiffs") sue Defendant City of Pensacola ("the City") pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.* ("Title VII"); the Florida Civil Rights Act of 1992, Fla. Stat. § 760 ("FCRA"); and 42 U.S.C. § 1983.  Plaintiffs, who are black firefighters employed by the City, assert they have been subjected to a racially hostile work environment, disparate treatment, and retaliation.  Glover further alleges that the City denied him leave to attend a sick family member, in violation of the Family Medical Leave Act, 29 U.S.C. § 2601, *et seq.* ("FMLA").  Pending is the City's motion for summary judgment.  Also pending are plaintiffs' three motions for leave to file additional evidence, to which the City has responded in opposition, and plaintiffs' motion for leave to file a reply to the City's response.  As explained below, the court DENIES the motions for leave to file additional evidence and the motion for leave

---

     [1]  All claims against defendant Pensacola Professional Firefighters Local Chapter 707 ("the Union") have been dismissed, either pursuant to the parties' notice of settlement or the court's December 18, 2007, order granting the Union's Fed.R.Civ.P. 12(b)(6) motion.

to file a reply, and it GRANTS in part and DENIES in part the motion for summary judgment.

**MOTIONS FOR LEAVE TO FILE ADDITIONAL EVIDENCE and TO FILE A REPLY**

The court first addresses plaintiffs' three "Consented Motion[s] for Leave to File Response Opposing Affidavits Submitted by Defendant on September 19, 2008." Responding, the City states that contrary to plaintiffs' representation that it consents to the motions it in fact objects.  Regardless, the City submits, plaintiffs have offered no good cause to allow the late submission of additional evidence and thus their motions should be denied.  Plaintiffs seek leave to reply to "clarify" or correct "misstatements" they contend the City makes in its response.

The docket reflects that on August 28, 2008, the City filed the instant motion for summary judgment, as well as a supporting memorandum, statement of undisputed material facts, and numerous exhibits.  On September 2, 2008, the court entered an order on the motion setting an advisement date of September 19, 2008.  Plaintiffs filed a memorandum of law and statement of disputed facts in response on September 18, 2008, and on September 19, 2008, they filed affidavits and other evidentiary materials.  Also on September 19th the court entered an order noting that pursuant to N.D.Fla.Loc.R. 7.1(C) plaintiffs' response had been due no later than fourteen days after the filing of the motion for summary judgment, or September 12, 2008.  The court advised plaintiffs that because their response was untimely it would not be considered.[2]  The court additionally stated that the evidentiary materials filed September 19th were timely.[3]

Because plaintiffs' untimely statement of disputed facts is not considered in ruling on the motion for summary judgment, pursuant to local rule plaintiffs are deemed to have

---

[2]   This is not the first time this court has found it necessary to hold plaintiffs' counsel accountable for her failure to comply with its rules and procedures.  The court has been forced repeatedly to correct and instruct counsel with respect to proper filing procedures, even to the point of requiring counsel to take additional training on the use of the electronic docketing system.  The court has previously cautioned counsel that her performance must improve significantly or her ability to continue to practice before it could be restricted. *See* docs. 13, 40, 43. *See also Johnson v. Winter*, 3:06cv188/MCR, doc. 39 (admonishing counsel for unsatisfactory filing practices and submitting "chaotic" response that did not constitute statement of disputed facts that complied with local rules).

[3]   The advisement order in fact directed that summary judgment materials should be filed *prior to* September 19, 2008, making the deadline September 18, 2008.  Because the court previously advised that materials filed September 19th were timely, however, it continues to recognize that date for all parties.

admitted the material facts set forth by the City in its statement of undisputed facts. N.D.Fla.Loc.R. 56.1(A). ("All material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement to be filed and served by the opposing party."). The failure to present a timely statement of material facts also affects the consideration of plaintiffs' summary judgment evidence, which includes some one hundred pages of deposition transcript excerpts and thirty-two pages of fact-intensive, single-spaced affidavits.[4]  Without a statement of disputed facts or memorandum, there are no references from plaintiffs to their extensive evidentiary sources by page, paragraph, number, or other detail sufficient to facilitate the court's review, as Local Rule 56.1(A) requires.  Accordingly, other than as noted or for purposes of continuity, the court has not considered plaintiffs' summary judgment evidence.[5]

Also on September 19, 2008, the City filed additional evidence in the form of a brief deposition transcript excerpt that had been referenced in defendant's statement of undisputed facts and two short affidavits that had not previously been referenced.[6]  Affixed to the City's notice of filing the affidavits is a Local Rule 7.1(B) certificate that states plaintiffs have expressed no objection to the filing of the documents, subject to plaintiffs' obtaining leave to file responsive evidence by September 25, 2008.  Plaintiffs' conditional agreement to the filing of this evidence does not govern whether the court will accept it. As this evidence is timely (as is all of the evidence filed September 19, 2008, including plaintiffs') and in satisfactory compliance with federal and local procedural rules, it should

---

[4]  *See* Local Rule 5.1(b)(3) (requiring all documents tendered for filing, or filed electronically, to be double-spaced).

[5]  Attached to the fourth amended complaint are plaintiffs' EEOC and/or FCHR charges of discrimination against the City, including their attached affidavits. *See* Doc. 71. The court has considered these affidavits in ruling on the instant motion, to the extent statements contained in the affidavits are based on personal knowledge and are not speculative, immaterial, or constitute hearsay. The other evidence considered by the court are the City's exhibits at docket entries #109, 119, and 120. Also, as noted below, where appropriate as an aid to its review, the court refers to allegations made in plaintiffs' affidavits submitted September 19, 2008.

[6]  The City's statement of material facts contains no reference by page, etc., to the two additional affidavits filed September 19, 2008, and the City did not seek leave to amend their statement of facts or memorandum to include such reference.  Nevertheless, given that the two double-spaced documents consist of only six pages total and that—unlike plaintiffs' evidence—the limited information they contain may be easily navigated without references, the affidavits will not be refused for the failure to comply with Local Rule 56.1(A)'s citation requirements.

and will be accepted. As to plaintiffs' contention they should be allowed to refute statements made in the City's affidavits through the filing of their September 25, 2008, evidence, the court is unpersuaded.  Much of the September 25, 2008, evidence is not responsive to the City's affidavits filed September 19, 2008, but rather apparently is an attempt by plaintiffs to avoid the consequences of having failed to timely file their statement of disputed facts and memorandum of law.  Plaintiffs were given the opportunity to file their responsive memorandum within the time provided by Local Rule 7.1(C) and *all* of their relevant evidence within the advisement period.  While plaintiffs' evidence filed September 19, 2008, was timely, the same is not true for either their memorandum and statement of facts or the additional evidence submitted September 25, 2008.  Plaintiffs have failed to offer any cause, much less good cause, for their filing approximately fifty additional pages of exhibits well after the advisement period has concluded.  Plaintiffs' motions therefore are denied.  Their motion to file a reply is also denied.

## MOTION FOR SUMMARY JUDGMENT

### Standard of Review

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  A factual dispute is "`genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed. 2d 202 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing [substantive] law." *Anderson*, 477 U.S. at 248; *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992).  The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor.[7] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "If reasonable minds could differ on

---

[7]   What are stated as "facts" for purposes of summary judgment review, however, may not be the actual facts. See Montount v. Carr, 114 F.3d 181, 182 (11th Cir. 1997).

the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citation omitted). Nevertheless, a general denial unaccompanied by any evidentiary support will not suffice. *See, e.g., Courson v. McMillian*, 939 F.2d 1479 (11th Cir. 1991); *Hutton v. Strickland*, 919 F.2d 1531 (11th Cir. 1991). Furthermore, the court is not obliged to deny summary judgment for the moving party when the evidence favoring the nonmoving party is merely colorable or is not significantly probative. *See Anderson*, 477 U.S. at 249. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. Indeed, the existence of a scintilla of evidence in support of the nonmovant's position is insufficient; the test is "whether there is [evidence] upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Id.* at 252. The moving party has the initial burden of showing the absence of a genuine issue as to any material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). Once the movant satisfies its burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmovant to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (emphasis omitted). Otherwise stated, the nonmovant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

**BACKGROUND**

The following background information is taken largely, and often verbatim, from the City's statement of undisputed facts.

The Pensacola Fire Department ("Fire Department") provides fire protection and emergency medical services to the Pensacola, Florida, community. The Fire Department is organized as a paramilitary organization, with the following positions in their hierarchical order: fire chief, deputy chief, battalion chief, captain, lieutenant, and firefighter. Relevant to this case, James A. Dixon, Jr., ("Dixon") served as the Fire Department's fire chief from 1993 to August 2006, and Mel Waters ("Waters") served as acting interim fire chief from August 2006 until August 2008. Al Coby ("Coby") has served as the City of Pensacola's assistant city manager since 1987 and presently serves as the interim city manager. In his

capacity as assistant city manager Coby supervised the Fire Department, including reviewing and approving all personnel decisions.  Both Dixon and Waters are white; Coby is black.  Johnson and Glover have both been employed by the City since 1989, when they were hired as firefighters.  Johnson was promoted to the rank of lieutenant in 1995 and is currently employed in that position.  Glover attained the rank of battalion chief in 2005.  Cobbs began his employment as a firefighter in 1993, and, except for a brief period, has been continuously employed by the City since that time.  Streeter was hired as a firefighter by the City in 1996.  Both Cobbs and Streeter are captains, having been promoted to their current ranks in May 2008.

Among other allegations, plaintiffs in this case assert they suffered racial discrimination in connection with examinations and promotions, overtime, and training opportunities.  A collective bargaining agreement, which the Union negotiated with the City, governs the wages, hours, and other terms and conditions of plaintiffs' employment, including promotions, overtime, and training.  An independent three-member Civil Service Board ("the Board") governs the promotions process for classified service positions for the City's Fire Department.[8]  Its functions, among others, include approving the qualifications for promotion, certifying the eligibility of employees to take promotion examinations, creating and administering promotion examinations, and certifying promotion lists from which candidates may be selected for advancement.  Under its promotions process, the Board certifies a list of the five candidates (more, if there are ties) with the highest scores on the written examination, in order of their ranking.  The City management (which includes the fire chief, city manager, and assistant city manager) selects the candidates to fill vacant positions; any candidate on the promotion list is eligible for selection.  Generally, promotion lists are effective for one year from the date the original list of eligible candidates is certified.  On occasion, however, the Civil Service Board may extend an eligible register in accordance with the Civil Service Act.

Plaintiffs filed this action July 26, 2005. The court rejected plaintiffs' initial complaint and two subsequent complaints, twice requiring plaintiffs to file a more definite statement and once dismissing some of their claims against the City and the Union, with leave to amend certain claims. On January 3, 2008, plaintiffs filed a fourth amended complaint,

---

[8]  The Board is not a defendant in this action.

which is the operative complaint at this juncture.  It contains five federal claims against the City: Count I, hostile work environment (Title VII); Count II, disparate treatment (Title VII); Count V, equal protection (§ 1983); Count VI, retaliation (Title VII); and Count VIII, FMLA violation (Glover only).  Invoking the court's supplemental jurisdiction, plaintiffs also assert three state law claims against the City: Count III, hostile work environment (FCRA); Count IV, disparate treatment (FCRA); and Count VII, retaliation (FCRA).[9]

**DISCUSSION**

The analysis for Title VII claims is the same as that for FCRA claims. *See Albra v. Advan, Inc.*, 490 F.3d 826, 834 (11th Cir. 2007); *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998) (stating that "[t]he Florida courts have held that decisions construing Title VII are applicable when considering claims under the Florida Civil Rights Act, because the Florida act was patterned after Title VII"); *The Florida State University v. Sondel*, 685 So.2d 923, 925 (Fla. 1st DCA  1996) ("Federal case law interpreting Title VII . . . is applicable to cases arising under the Florida Act") (citation omitted); *Wilbur v. Corr. Servs. Corp.*, 393 F.3d 1192,1195 n. 1 (11th Cir. 2004) (retaliation claims brought under FCRA are analyzed under the same framework as those brought under Title VII).  Also, when, as here, § 1983 is used as parallel remedy for Title VII violations the elements of the two causes of action are the same. *Mitchell v. Pope*, 189 Fed. Appx. 911, 913 n.2 (citing *Hardin v. Stynchcomb*, 691 F.2d 1364, 1369 n. 16 (11th Cir. 1982)); *see also Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985) (stating that where a plaintiff predicates liability "under Title VII on disparate treatment and also claims liability under sections 1981 and 1983, the legal elements of the claims are identical . . . [and] we need not discuss plaintiff's Title VII claims separately from his section 1981 and section 1983 claims.").  Additionally, a similar exhaustion requirement also applies to both Title VII and FCRA claims. *Prieto v. City of Miami Beach*, 190 F.Supp.2d 1340, 1343 n.2 (S.D.Fla. 2002).  However, "exhaustion of state administrative remedies is not a prerequisite to bringing a section 1983 action."[10]  *See Majette v. O'Connor*, 811 F.2d 1416,

---

[9]   Count IX, plaintiffs' claim pursuant to 28 U.S.C. § 1981 against the Union, was dismissed in accordance with the parties' notice of settlement.

[10]   The court further notes that Florida's presuit notice requirements contained § 768.28(6), Fla. Stat., do not apply to plaintiffs' federal or state law claims in this case. *See, e.g., Maggio v. Florida Department of Labor and Employment Security*, 899 So.2d 1074, 1078-82 (Fla. 2005) (finding that plaintiff asserting a cause

1418 (11th Cir. 1987) (citing *Patsy v. Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982)).

To the extent appropriate, the court therefore considers together plaintiffs' like Title VII and FCRA claims of a hostile work environment, disparate treatment, and retaliation, as well as their §1983 equal protection claim.   Glover's FMLA claim is addressed separately.

<u>Hostile Work Environment</u>

Plaintiffs complain that during their employment with the City one or more of their white Fire Department co-workers or supervisors have created a racially hostile work environment by, *inter alia,* making racial slurs, leaving hangman's nooses in work areas, and wearing white sheets Ku Klux Klan-style in the presence of black employees.[11]  The City seeks summary judgment on plaintiffs' hostile work environment claims on the grounds plaintiffs failed to exhaust their administrative remedies by adequately describing the alleged discriminatory conduct in their charges of discrimination filed with the Equal Employment Opportunity Commission ("EEOC") or Florida Commission on Human Relations ("FCHR").  Additionally, the City contends that plaintiffs have failed to identify in their fourth amended complaint any discriminatory conduct that occurred within the applicable limitations period.  Alternatively, the City argues it is entitled to summary judgment because plaintiffs have failed to make out a *prima facie* case of racial discrimination based on a hostile work environment.

To bring a claim for discrimination in federal court under Title VII a plaintiff first must exhaust his administrative remedies by filing a charge of discrimination with the EEOC.

---

of action under the FCRA was not required to give prior notice of her claim pursuant to § 768.28(6)).

[11]   The racial slurs of which plaintiffs complain include the terms "DAN," which they describe as an acronym for "Dumb Ass Nigger"; "niggers"; "black beetles"; and, in reference to black children, "nigglets." Plaintiffs also reference hangman's nooses that allegedly were present in the workplace on four occasions and two instances in which a white firefighter donned a sheet or pillowcase.  According to plaintiffs, these allegations are "essentially the basis" of their hostile work environment claims.

Plaintiffs also complain of being given the "cold shoulder" by white firefighters, which has caused them to question whether those firefighters would do "all [they] should" to protect a black firefighter during a fire. Plaintiffs then point to the firefighting death of fellow black firefighter Maurice Bartholomew in 2000.  The court notes that the implication of plaintiffs' allegations—that Bartholomew's death was somehow connected to the failure of white firefighters to protect him—is more than simply unsupported; it is wildly speculative.  Moreover, there is no evidence that even remotely suggests plaintiffs' white co-workers have threatened to, or might in fact, fail to protect the plaintiffs while fighting a fire.  The court therefore does not address this allegation further.

*Gregory v. Georgia Department of Human Resources*, 355 F.3d 1277, 1279 (11th Cir. 2004) (*per curiam*); *Alexander v. Fulton County, Georgia*, 207 F.3d 1303, 1332 (11th Cir. 2000) (stating that  "[n]o action alleging a violation of Title VII may be brought unless the alleged discrimination has been made the subject of a timely-filed EEOC charge").  EEOC regulations provide that charges should contain, among other things, "[a] clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices." 29 C.F.R. § 1601.12(a)(3). Even though the regulations require that charges contain particularized information, courts are "extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII]." *Gregory*, 355 F.3d at 1280 (citation omitted). Accordingly, "the scope of an EEOC complaint should not be strictly interpreted." *Id.*  Title VII further provides that in order to be timely within a deferral state, such as Florida, a charge of discrimination must be filed within 300 days of the last discriminatory act.  42 U.S.C. § 2000e-5(e)(1); *see also National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 109, 122 S.Ct. 2061, 2070, 153 L.Ed.2d 106 (2002) (stating that "[i]n a State that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a grievance with that agency must file the charge with the EEOC within 300 days of the employment practice; in all other States, the charge must be filed within 180 days.").  Alleged violations of the FCRA must be asserted in a charge of discrimination submitted to the FCHR within 365 days of the occurrence. Fla. Stat., § 760.11(1).

The affidavits that plaintiffs submitted individually in conjunction with their charges of discrimination complain, albeit in sketchy terms, of racial slurs, Ku Klux Klansman mimicry, and nooses in the workplace.[12]  Although the references in the affidavits were not specific, they nevertheless evidently were adequate to cause the EEOC to pursue an investigation of plaintiffs' workplace for a hostile work environment because a letter written by the EEOC investigator dated April 11, 2005, discusses her inquiry into plaintiffs' allegations.   Nevertheless, as stated in the letter, the outcome of that investigation was unfavorable to plaintiffs, at least in part because the investigator was unable to verify that

---

[12]   These affidavits were not before the court when, in dismissing Counts I and III without prejudice, it previously concluded that plaintiffs had made no allegations in their charges of discrimination of alleged racial slurs, threats, reprimands, fears, or other conditions that would reasonably have led to an investigation of the workplace for a hostile work environment.

an alleged event actually occurred or she determined that it occurred so far in the past "as to make it outside the Commission's purview."[13]   In any event, because plaintiffs' EEOC charges are marginally adequate in describing the alleged harassing conduct, the court is persuaded that plaintiffs' present judicial claims of hostile work environment under Title VII and the FCRA should be considered administratively exhausted in that respect. *Gregory*, 355 F.3d at 1280 (stating that the proper inquiry in examining whether a judicial claim has been exhausted administratively is whether the claims are "like or related to, or grew out of, the allegations contained in [the employees'] EEOC charge").

The City also argues that plaintiffs have not shown that the harassing conduct alleged in their judicial complaint occurred within the applicable limitations period for filing their administrative charges of discrimination, an allegation that requires a determination of the limitations period for each plaintiff. Unfortunately, the City does not identify the applicable statutory filing periods in this case nor is the court able to do so confidently from the available record.[14]   The charges against the City reflect they were filed or signed between March 27, 2004, and August 26, 2004: Glover's FCHR complaint was signed March 27, 2004; Streeter's FCHR complaint was filed April 19, 2004; Johnson's EEOC complaint was signed June 18, 2004; and Cobbs' EEOC complaint was filed August 26, 2004.[15]   The court will assume the earliest of the above filing dates—Glover's—as the filing date for all the plaintiffs.[16]   This calculation results in a limitations period reaching

---

[13]   *See* doc. 109-10.

[14]   *See* docs. 71-9 through 71-19, and doc. 109-7, 109-8,109- 9, and 109-10.

[15]   The court could not locate in the record both an EEOC and FCHR complaint against the City for each plaintiff nor a complaint for Glover or Johnson with a clearly identified filing (rather than simply signing) date. Even if plaintiffs have failed to comply with all procedural requirements for exhausting their claims administratively, the City has waived the right to challenge any such deficiencies as it has not specifically raised challenges to exhaustion other than those discussed. *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982) (stating "that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."); *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004).

[16]   The court believes this approach is the simplest one for the purpose of discussing the timeliness of plaintiffs' hostile work environment claims.  If the allegations in Glover's administrative complaint, the first to be filed, were untimely then so must be the claims submitted later by Johnson, Cobbs, and Streeter.

back to March 28, 2003, for the FCRA claim and to June 1, 2003, for the Title VII claim.[17]

Accepting that the statutory period commenced approximately March 28, 2003, for the FCRA claim, and June 1, 2003, for the Title VII claim, the court concludes that least some of plaintiffs' allegations about the use of racial slurs in the workplace in 2003-04 are timely.  As explained by the Eleventh Circuit, the Supreme Court has

> simplified the limitations inquiry in hostile work environment cases. The Court instructed that a hostile work environment, although comprised of a series of separate acts, constitutes one 'unlawful employment practice,' and so long as one act contributing to the claim occurs within the filing period, 'the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.'

*Watson v. Blue Circle, Inc.,* 324 F.3d 1252, 1258 (11th Cir. 2003) (discussing *National Railroad Passenger Corp.*, 536 U.S. at 116).[18]  The Supreme Court additionally explained in *National Railroad Passenger* that unlike "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire," a hostile work environment claim addresses acts whose "very nature involves repeated conduct," such as "discriminatory intimidation, ridicule, and insult." *National Railroad Passenger Corp*, 536 U.S. at 114-16. Accordingly, hostile work environment "claims are based on the cumulative effect of individual acts." *Id.* at 115.

The allegations of racist epithets used in 2003-04, as well as the allegations regarding the use of slurs, nooses, and white sheets in years prior, implicate acts whose "very nature involves repeated conduct" that has a cumulative effect. *National Railroad Passenger Corp*, 536 U.S. at 114.  Thus, in the court's view, plaintiffs effectively complain about a single unlawful employment practice: a long-term, ongoing hostile work

---

[17] As noted, § 1983 has no exhaustion of administrative remedies requirement.  Section 1983 claims, however, must be commenced in Florida within four years of the allegedly unconstitutional or otherwise illegal act or they will be deemed untimely. *See Baker v. Gulf & Western Indus., Inc.*, 850 F.2d 1480, 1483 (11th Cir. 1988); *Owens v. Okure*, 488 U.S. 235, 249-50, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989) (stating that § 1983 claims are governed by the forum state's residual personal injury statute of limitations). In this case, because plaintiffs filed this action on July 26, 2005, the statutory period for plaintiffs' § 1983 equal protection claim commenced July 26, 2001.

[18] The Supreme Court's ruling in *National Railroad Passenger* applies equally to § 1983 cases. *See Hildebrandt v. Illinois Dept. of Natural Resources*, 347 F.3d 1014, 1036 n.18 (7th Cir. 2003); *Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir.2003); *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1058-61 (9th Cir. 2002); *Reed v. Okereke*, 2006 WL 2444068, *24 n.11 (N.D.Ga. 2006).

environment created by racially harassing conduct committed by some white Fire Department firefighters and supervisors. *See Shields v. Fort James Corp.*, 305 F.3d 1280, 1281-82 (11th Cir. 2002) ("a hostile work environment claim should be reviewed in its entirety, so long as one of the events comprising it fell within the statute of limitations"). As *National Railroad Passenger Corp.*, instructed, "[i]t does not matter . . . that some of the component acts of the hostile work environment fall outside the statutory time period." *Id.* Because at least some of the racially offensive conduct allegedly took place within the limitations periods for plaintiffs' Title VII and FCRA claims, the court concludes that plaintiffs' hostile work environment claims—in their entirety—are not time-barred.[19]

The court therefore proceeds to consideration of whether plaintiffs have established their hostile work environment claims under Title VII by presenting proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Miller v. Kenworth of Dothan Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002) (quotation omitted). To make out a *prima facie* claim of hostile work environment, a plaintiff must establish: "(1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment [was] based on a protected characteristic of the employee . . .; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability." *Id.* at 1275.

As discussed, due to plaintiff's failure to comply with the local rules of this district, the court has before it no statement of disputed facts, no memorandum, and no evidence from plaintiffs opposing summary judgment. The City's materials, as well as the affidavits plaintiffs filed with their complaint (and accepted by the court), constitutes the entire evidentiary record. This evidence reflects that plaintiffs are members of a protected group. However, even assuming the evidence shows each plaintiff has been subjected to unwelcome race-based harassment, the court concludes the evidence is insufficient to

---

[19]  Plaintiffs also complain of a noose incident that occurred in 2002. For purposes of plaintiffs' § 1983 equal protection claim alleging a hostile work environment, this incident would also fall within the limitations period.

create a jury question as to whether the harassment was sufficiently severe or pervasive.[20]

Plaintiffs in this case allege in their complaint or refer to in their affidavits roughly five or six instances in which Fire Department employees displayed nooses or sheets: one incident involving a sheet that occurred in 1996 and perhaps another incident not identified by date, two noose incidents identified as occurring in 1999 and either 2000 or 2002, and two other noose incidents with no readily identifiable dates.[21]   Plaintiffs also complain of numerous instances of the use of racial slurs.   A survey of the relevant legal authority reflects that evidence in support of plaintiffs' hostile work environment claims falls short of demonstrating the type of conduct recognized by the Eleventh Circuit as sufficiently severe and pervasive.   For example, the Eleventh Circuit has found that a racially hostile work environment existed where "three to four times a day" the foreman and others called plaintiff "Wetback," "Spic," and "Mexican Mother F_____ " and used the derogatory terms "in an intimidating manner, shouting them at [plaintiff] during the course of berating him for his job performance or when they were "arguing with him," were "mad with him," or were "taunting him . . . ."  *Miller*, 277 F.3d at 1276-77.  Similarly, in *Mack v. ST Mobile Aerospace Engineering, Inc.*, 195 F.Appx 829, 837-38 (11th Cir. 2006), the court held a jury question existed on evidence showing racial graffiti had permeated the workplace premises for many years; the plaintiffs discovered seven nooses in two years' time; employees and management directed offensive words, jokes, and statements to minority employees; and employees were unable to perform their jobs effectively or productively. *See also Webb v. Worldwide Flight Serv., Inc.*, 407 F.3d 1192, 1193 (11th Cir. 2005) (observing that evidence was sufficient for jury to find hostile work environment where supervisor referred to plaintiff on a daily basis for two years as a "nigger" and a "monkey," and described him as being "from the tribe."); *E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068-69 n.3 (11th

---

[20]   The Supreme Court has identified four factors courts should  consider in determining whether an environment is hostile or abusive: (1) "the frequency of the discriminatory conduct"; (2) the severity of the conduct; (3) whether the conduct "is physically threatening or humiliating, or a mere offensive utterance"; and (4) whether the conduct "unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.  No single factor is controlling. *Mangrum v. Republic Indus., Inc.*, 260 F.Supp.2d 1229, 1247 (N.D.Ga. 2003) (quoting *Harris*, 510 U.S. at 23). Instead, a court must "look[] to the totality of the circumstances to determine whether harassment is sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment." *Mendoza*, 195 F.3d at 1258.

[21]   The allegations of plaintiffs' complaint of course do not constitute evidence.  The court refers to the allegations here simply as an aid in discussing plaintiffs' claims.

Cir. 1990) (indicating that supervisor's racist slurs, including "niggers," "ignorant niggers," and "swahilis.," and his statements that "blacks were meant to be slaves" and were of lower intelligence, and "[t]hose niggers out there will not get anywhere in this company" created racially hostile work environment); *Johnson v. Booker T. Washington Broadcasting Service, Inc.,* 234 F.3d 501, 509 (11th Cir. 2000) (concluding that "roughly fifteen separate instances of harassment over the course of four months" were sufficiently frequent).

Where the type of conduct described in *Miller and Mack* has been implicated but the conduct occurred less frequently or was less widespread or less offensive in nature—as is true in this case— the court found no racially hostile work environment.  In *Barrow v. Georgia Pacific Corp.*, 144 Fed. Appx. 54, 57-58 (11th Cir. 2005),[22] the Eleventh Circuit concluded that evidence of "displays of the rebel flag on tool boxes and hard hats, the letters 'KKK' on a bathroom wall and on a block-saw console, and a noose in another employee's locker," as well as several  threats to "kick [plaintiff's] 'black ass'" and the use of racial slurs including "nigger," "boy," and "black boy," reflected conduct that was "isolated," "sporadic," and "random" and did not amount to "severe and pervasive harassment." *Barrow*, 144 Fed. Appx. at 57-58.  Additionally, in *Washington v. Kroger Co.*, 218 Fed. Appx. 822, 825 (11th Cir. 2007), the Eleventh Circuit found no hostile environment when a co-worker allegedly hung a figurine representing the plaintiff by a rope and called the plaintiff racially-suggestive names such as "boy." In a recent case, *Quarles v. Con-Way Freight, Inc.*, 2008 WL 1994916, *6-7 (M.D. Fla. 2008), a district court relied on *Barrows* in finding that "six instances of racially-related conduct over a period of a few years" witnessed by the plaintiff and "approximately four other instances that were reported to [him]"—which included use by a supervisor and co-workers of offensive racial terms, showing a stuffed animal gorilla that portrayed a black employee, and being told of a noose that had been shown to another black employee—fell "well short of the required level of severity and frequency to support a hostile environment claim."  *See also Smith v. Beverly Health and Rehab. Serv., Inc.*, 978 F.Supp. 1116, 1122 (N.D.Ga. 1997) (concluding that a supervisor's comments that "all that mooly can do is make coffee and bring it to me," "these goddamn Georgia niggers think they own Georgia," and "where I come from niggers knew their place," did not rise to the level of severe and pervasive racial harassment).

_____

[22] Under 11th Circuit Rule 36-2, unpublished cases may be cited as persuasive although not binding authority.

The incidents alleged by plaintiffs apparently took place over approximately fifteen years, making the occurrences infrequent and isolated. *See Mendoza*, 195 F.3d at 1242-43 (finding that approximately six instances of objectionable conduct over period of eleven months were not frequent).  More specifically, the evidence suggests that some of the most egregious conduct alleged that is identified by date—involving a sheet incident in 1996 and two noose incidents identified as occurring in 1999 and either 2000 or 2002—took place from two to eight years before plaintiffs filed their discrimination charges in 2004 and from three to nine years prior to the filing of this action in 2005.    Further, the racial slurs described by plaintiffs largely were made in the 1990s or earlier; evidently, far fewer instances occurred after 2003 and of those it seems that few, if any, were directed at any of the plaintiffs or spoken in their presence.[23]   *See McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008), *petition for cert. filed*, (U.S. Aug. 7, 2008) (No. 08-163) (stating that four "instances of racially derogatory language alone, extending over a period of more than two years, are too sporadic and isolated to establish that [defendant's] conduct was so objectively severe or pervasive as to alter the terms and conditions" of plaintiff's employment"); *see also Harris*, 510 U.S. at 21, 114 S.Ct. 367 (finding that the "'mere utterance of an . . . epithet which engenders offensive feelings in a employee' . . . does not sufficiently affect the conditions of employment to implicate Title VII"). Moreover, there is no evidence showing that, as a whole, plaintiffs were subjected to conduct so severe as to pose an actual threat of physical harm to them or to unreasonably interfere with their work performance.  *Harris*, 510 U.S. at 23.  There is no evidence that plaintiffs have been unable to perform their jobs.

Based on the totality of the circumstances in this case, as presented on the record before the court, the court concludes that plaintiffs have failed to show that a genuine issue

---

[23]  The court is not suggesting that all of the racial comments must have been directed at the plaintiffs in order to support their hostile work environment claim. *See Reeves v. C.H. Robinson Worldwide, Inc.*, 525 F.3d 1139,1144 (11th Cir. 2008) (stating that "[i]t is well established that racially offensive language need not be targeted at the plaintiff in order to support a Title VII hostile work environment claim."); *Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (11th Cir. 1995) ("A plaintiff may have a viable hostile environment claim even if the racial remarks were not directed at her."); *Busby v. City of Orlando*, 931 F.2d 764, 785 (11th Cir. 1991) (racial slurs not directed at plaintiff or not made in plaintiff's presence may be considered as evidence of a hostile work environment.). Nevertheless, a claim of hostile work environment may be supported by hearsay only if the plaintiff "was aware of the harassing incidents at the relevant time at which [he] alleges [he] experienced the hostile environment." *Hudson v. Norfolk Southern Ry. Co.*, 209 F.Supp.2d 1301, 1326 (N.D.Ga. 2001).  No such allegations are present in this case.

of material fact exists as to whether their "workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions" of their employment and create an abusive working environment." *Miller*, 277 F.3d 1275.  The City is therefore entitled to summary judgment on plaintiffs' hostile work environment claims.

Disparate Treatment

Plaintiffs also allege they have been discriminated against with respect to test-taking and promotions, training opportunities, and overtime assignments.  Further, they complain that, unlike white employees, they have been required to perform menial tasks around the station houses, have been unfairly reprimanded or stripped of leave, have not been reimbursed for training expenses, and have received little or no recognition when they have earned promotions or awards.   The City contends that the promotion claims are time-barred because no discrete act occurred within the filing periods or, alternatively, that plaintiffs have failed to establish a *prima facie* claim of failure to promote.  The City further argues that plaintiffs have not established a *prima facie* claim of disparate treatment in connection with training opportunities or overtime and that the other conduct of which they complain also is untimely or does not constitute disparate treatment.

Unlike hostile work environment claims, which are based on the cumulative effect of individual acts, *National Railroad Passenger Corp*, 536 U.S. at 115, disparate treatment claims implicate discrete acts which must occur within the statutory filing period in order to be actionable. In this case, taking a statutory period commencing July 26, 2001, for the § 1983 claim; March 28, 2003, for the FCRA claim; and June 1, 2003, for the Title VII claim, the court concludes that claims based on allegedly unlawful conduct relating to promotions occurring prior to those dates are time-barred. By his own testimony, Johnson has not been denied advancement since at least 1999, when he says he last attempted to take the captains' promotion test.  Any claim with respect to Cobbs' failure to be promoted in November 1999 likewise clearly is untimely.  The only opportunity for promotion that was open to Cobbs during the limitations period for purposes of either § 1983, Title VII, or FCRA was in April 2004, but he was promoted to lieutenant at that time and apparently does not allege any violations of his rights in connection with that

promotion.[24]  Glover was promoted to battalion chief in 2005 on his first attempt and there appears to be no claim asserted with respect to this promotion. Title VII or FCRA claims pertaining to promotions for which Glover was eligible in 1996 or February 2003 also are time-barred, although with a limitations period commencing July 26, 2001, a § 1983 claim by Glover with respect to the February 2003 promotion is timely.

Streeter, like Cobbs, was not promoted to lieutenant in November 1999 but this claim too is time-barred.  Streeter was also eligible for promotion to lieutenant from the March 2003-September 2004 list, however, but unlike Cobbs he was not chosen.  Thus a claim of disparate treatment by Streeter in connection with this denial of promotion, whether under Title VII, the FCRA, or § 1983, is timely.[25] Another promotion opportunity for Streeter arose during the limitations period but he in fact was promoted in November 2004 from the October 2004-October 2005 lieutenants' eligibility list, and in May 2008 he was selected for promotion to captain.

Having determined that Streeter's claims of being denied promotion to lieutenant from the March 2003–September 2004 list and Glover's § 1983 claim in connection with his February 2003 promotion are not time-barred, the court considers the City's argument that plaintiffs have not satisfied the *prima facie* requirements.  Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973),[26] the plaintiff bears the initial burden of presenting sufficient evidence to allow a reasonable jury to determine that he has satisfied the elements of his *prima facie* claim. *Id.* at 802. If a *prima facie* case is established by the plaintiff, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision. *Id.*  If a legitimate reason is articulated, the burden shifts back to the plaintiff to show that the defendant's reason was

---

[24]  Cobbs was not on the January 2005 captain's promotion list and thus he was not eligible for promotion to that rank at the time.  In May 2008 Cobbs was advanced to the rank of captain.

[25]  The fourth amended complaint does not contain the specific allegation that Streeter was denied promotion from the March 2003-September 2004 lieutenants' list.  Reading the complaint broadly, however, the court concludes that plaintiffs' complaints of failure to promote encompass this claim.

[26]  With no direct evidence to support plaintiffs' claims, the court analyzes the claim using the *McDonnell Douglas* burden-shifting framework reserved for discrimination claims supported by circumstantial evidence. *McDonnell Douglas*, 411 U.S. at 802-03.  *See also Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254-55, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).
.

pretextual. *Id.*  To establish a *prima facie* case of failure to promote a plaintiff must demonstrate that "(1) he . . . belonged to a protected class; (2) he . . . was qualified for and applied for a position that the employer was seeking to fill; (3) despite his qualifications, he . . . was rejected; and (4) the position was filled with an individual outside the protected class." *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 768 (11th Cir. 2005) (citation omitted).[27]

Glover can satisfy several of the *prima facie* case elements: he belongs to a protected class and was qualified and applied for the captain's position.  As explained, however, he is unable to satisfy the third element of a *prima facie* case. Glover complains that he was briefly delayed in taking the captains' examination in November 2002 due to problems with testing procedures that only he, and not the white test takers, experienced and that he suffered a delay of three months in receiving a pay increase and acknowledgment of his advancement. The evidence shows that on December 2, 2002, Dixon sought permission to fill a vacancy for the position of facilities management captain. Dixon's request was approved by various City agencies, as well as Coby and the city manager, by December 10, 2002. Although Glover received the second highest score on the captains' examination and thus was ranked second on the December 2002 captains' promotion eligibility list, Dixon initially sought to offer the job to another candidate, who was white and who ranked below Glover. Coby declined to accept Dixon's first choice, however, and instead, on December 16, 2002, selected Glover.  On January 6, 2003, Coby and the

---

[27]  As explained in the court's December 18, 2007, order, contrary to the City's position the court finds that a *prima facie* claim in failure to promote cases does not include as part of the fourth prong the requirement that a plaintiff must show the individual who received the promotion was equally or less qualified than the plaintiff.  It is true that numerous Eleventh Circuit panels have followed *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 n.7 (11th Cir.1983), which indicated in dicta that the *prima facie* standard included the "equally or less qualified" proviso. *See, e.g., Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1089 (11th Cir. 2004); *Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001); *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000). This court agrees with the conclusion in *Walker v. Mortham*, 158 F.3d 1177(11th Cir.1998), however, that the "earliest case" rule requires it to follow the former Fifth Circuit's decision in *Crawford v. Western Electric Co., Inc.*, 614 F.2d 1300, 1315 (5th Cir. 1980), which does not require a plaintiff to prove relative qualifications to establish *prima facie* failure to promote claim. *Walker*, 158 F.3d at 1193. *See also Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344, 1348 n.2 (11th Cir. 2007) (listing elements of *prima facie* claim and not including "equally or less qualified" requirement); *Harrington v. Disney Regional Entertainment, Inc.*, 276 Fed.Appx. 863, 872 (11th Cir.2007) (citing *Walker* for standard and its reliance on *Crawford*). *See also Gray v. Vestavia Hills Bd. of Educ.*, 2008 WL 5064890, *4 (11th Cir. 2008) (including relative qualifications requirement as part of *prima facie* claim but noting *Walker*'s holding that the qualifications of others is not relevant to the *prima facie* claim).

city manager formally approved Glover's selection, and on January 20, 2003, Glover was promoted.  On February 11, 2003, the Civil Service Board, whose approval for Glover's promotion was also required, confirmed Glover's selection, and Glover was appointed to his new position. All of the foregoing evidence indicates that despite any issues involved with the examination, Glover scored well and ultimately was selected for promotion. Thus Glover cannot show that despite his qualifications, he was rejected for the position. *Vessels*, 408 F.3d at 768.   Moreover, the evidence shows that Glover's promotion went forward with no appreciable delay.

Streeter also belongs to a protected class and there is no dispute that he was qualified and applied for the lieutenant's position and later rejected despite his qualifications.  The evidence also reflects that two of the three promotions were given to white males, who are persons outside Streeter's protected class.[28]  The court therefore concludes that Streeter can satisfy his initial burden of establishing a *prima facie* case of failure to promote with respect to the March 2003–September 2004 lieutenants' promotion list.  *McDonnell Douglas Corp.*, 411 U.S. at 802.

The burden now shifts to the City to articulate a legitimate, nondiscriminatory reason for failing to promote Streeter.[29]   The City's argument that it is entitled to summary judgment, however, stops at its contention that none of the plaintiffs has established a *prima facie* case of failure to promote.  The City failed to proceed further in the analysis and discuss its legitimate reasons, if any, for this specific action and its evidence in support. Thus the City has not met its burden to come forward with a legitimate nondiscriminatory reason for its refusal to promote Streeter to lieutenant from the March 2003-September 2004 promotion list.

Before turning to plaintiffs' other allegations of disparate treatment, the court briefly addresses another, recurring complaint made by plaintiffs pertaining to the promotions process employed by the City and the Civil Service Board.  According to plaintiffs, the City, the Union, and white firefighters secretly agreed to create six new captains' positions that eventually were given to white firefighters on the December 2002 captains' promotion list.

---

[28]   The third promotion was awarded to Cobbs.

[29]   Once a *prima facie* case has been established, the burden of production, but not persuasion, shifts to the defendant to put forth a legitimate, nondiscriminatory reason for the adverse employment action. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000).

According to plaintiffs, this secret agreement disadvantaged black firefighters who did not prepare for or take the captains' examination because they believed only one position would be available and thus they stood little chance of being selected for promotion. Additionally, plaintiffs complain that lower-ranked black firefighters also suffered because their opportunity for advancement to lieutenant was delayed as a result of the "secret" agreement.  Plaintiffs further contend that, again to the disadvantage of black candidates, the captains' eligibility list certified December 2002 was extended by the City an additional twelve months, to June 2004, for no reason other than to enable the white candidates to be advanced, while the March 2003, lieutenants' eligibility list was only extended six months, to September 2004.

The evidence before the court directly contradicts plaintiffs' unsupported contentions.  As explained by Coby in his affidavit, during bargaining sessions with the Union prior to 2003 a topic of negotiation concerned the Union's request for six new captains' positions and six new lieutenants' positions to man the City two rescue trucks. Budgetary limitations precluded the City from creating all twelve positions at the same time. Deciding it was in the City's best interest to have a more experienced, higher-ranking, and more qualified officer on each of the three watches into which the fire suppression employees' weekly work schedule is divided, Coby therefore made the decision to create six captains' positions only. This decision, Coby states, involved "no deception or attempts at non-disclosure to any rank and file member of the Fire Department."[30]  In fact, the bargaining sessions with the Union were conducted "in the sunshine" and audiotaped; Coby submits that plaintiffs, as bargaining unit members, thus could or should have known about the negotiations. Furthermore, the evidence shows that, like the lieutenants' promotion eligibility list, the captains' list was only extended six months—and both lists were extended not by the City but by the Civil Service Board.  Accordingly, plaintiffs' allegations regarding a secret agreement to create six new captains' positions in order to favor white candidates and the extension of the captains' list but not the lieutenants' list, again to the advantage of white candidates and the disadvantage of black candidates, are entirely without foundation.

The complaint also alleges that black firefighters are denied training opportunities.

---

[30]  Doc. 120-2 at 4.

The evidence reflects, however, that of the four plaintiffs only Johnson in fact asserts he has been denied requested training.[31] More specifically, Johnson complains that over the past ten years he has made numerous written requests for training to be certified to perform maintenance services on firefighting equipment known as SCOTT Airpaks; servicing the apparatus would entitle him to receive overtime pay.[32] Two other employees, both white, have undergone training to become certified on this equipment but Johnson has not. Additionally, in 2005 Johnson asked to attend the National Fire College but his request was denied. Johnson was told by others that his name had been drawn from a hat for selection but then, without explanation, he was rejected in favor of another employee, who is white. Johnson asked his battalion chief about the decision not to send him to the Fire College; the chief advised Johnson he would get back to him regarding the matter but never did.

To establish a *prima facie* case of disparate treatment based on race, an employee must show that: (1) he is a member of a protected class; (2) he was subject to an adverse employment action; (3) his employer treated similarly situated employees who were not members of his class more favorably; and (4) he was qualified for the job or benefit at issue. *Gillis v. Georgia Department of Corrections*, 400 F.3d 883, 887 (11th Cir. 2005). An adverse employment action must effect "a serious and material change in the terms, conditions, or privileges of employment." *Davis v. Town of Lake Park, Florida*, 245 F.3d 1232, 1239 (11th Cir. 2001). Further, regardless of the employee's subjective view, the employment action must be adverse "as viewed by a reasonable person in the circumstances." *Id.*

Richard R. Harris ("Harris"), a white captain in the Fire Department, states in an affidavit that he and another white firefighter, Jack McClendon ("McClendon"), are the only two Fire Department employees presently qualified to service the SCOTT Airpaks. There is no information with respect to how McClendon came to be trained on the equipment, but

---

[31]   To the extent Cobbs, Streeter, and Glover complain in the affidavits attached to their charges of discrimination of the denial of training opportunities, the allegations pertain to other individuals, are so nonspecific as to be meaningless, or occurred so many years prior that they clearly are time-barred.

[32]   Johnson asserts in the affidavit attached to his charge of discrimination that he was denied other training opportunities early in his career with the Fire Department (which as noted previously commenced in 1989) or on unspecified dates. Any claim arising from such allegations either is too vague to be actionable or is time-barred.

Harris says he attended a SCOTT school in 1988 "on his own"; the SCOTT school paid for the training, while Harris paid for his transportation.[33]  In addition, Harris states that in 2001 he took an advanced course in "High Pressure Cylinder Inspection" related to the specialized "SCBA" apparatus, again at his own expense. The evidence also shows that in March 2004 Dixon informed Johnson that he "may be placed on [the list to repair SCBA equipment] if you hold the necessary certifications to repair these units.  Please provide [your battalion chief] with your certifications and we can place you on that list and schedule you accordingly."[34]

The City argues that Johnson has failed to establish a *prima facie* case of disparate treatment regarding training.  Based on the limited evidence before it, the court agrees.  Although Johnson complains that the City has not granted his numerous requests for SCOTT Airpaks training, there is no evidence that the City has prevented Johnston from obtaining the training he desires.  The only evidence before the court suggests that employees may obtain training on SCOTT Airpaks "on [their] own" and that, if Johnson obtained the training, perhaps at his own expense as Harris did, he would then be eligible to maintain the equipment and obtain overtime pay for those services. In sum, the court concludes that Johnson has not shown that being denied the opportunity to attend the National Fire College or not receiving SCOTT Airpaks training—and, consequently, the opportunity to receive overtime pay to service the Airpaks—constitutes an adverse employment action.  Nor has Johnson shown that the City treated similarly situated employees outside his protected class, *i.e.*, Harris and McClendon, more favorably than it treated him.

The complaint also contains a general allegation that plaintiffs have been denied the opportunity to earn overtime pay, and the more specific one that a collateral job Glover performed was taken from him when he was promoted to facilities management captain, although white firefighters in the same job have been allowed to perform overtime duties and earn extra income.  Both claims fail.  In their depositions Streeter, Glover, and Johnson each indicate he is unaware of the amount of overtime earned by other Fire Department employees, either during his own tenure as a City employee or from 2003 to

---

[33]   Doc.109-9.

[34]   Doc. 109-10.

the present.  Streeter  also acknowledges that he is unaware whether he earned more or less overtime than other employees during that time. Cobbs testified that he has no knowledge of overtime assignments and that, in any event, he was not discriminated against in this regard because he performed no duties that would entitle him to overtime. None of the plaintiffs has specifically identified the times at which this disparate treatment allegedly took place, other than to say vaguely that it continues to the present.  Moreover, and more importantly, none of the plaintiffs has adequately identified a similarly situated comparator. The complaint lists several names but the summary judgment evidence of record is insufficient to show that any of these individuals in fact is similarly situated to any plaintiff, in any relevant respect or to any significant degree. *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (stating that a plaintiff must establish that his comparators are "similarly situated in all relevant aspects."); *Wilson*, 376 F.3d at 1091 (holding that a "comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer.").

Moreover, although in his deposition Glover mentions by name a white facilities management captain who was permitted to perform outside duties, Glover has not shown that this captain was similarly situated to him.  According to Glover, he was not permitted to continue to perform his additional job of minority recruiter for overtime pay, while the other captain was allowed to participate in the Department's honor guard. There is no evidence that the specifics of the minority recruiting position which Glover says he was forced to give up (such as the time, training, or education required to perform it, or the benefits associated with it) were similar in all relevant aspects to the apparently ceremonial job which Glover asserts the white captain was permitted to continue to perform. *See Gaddis v. Russell Corp.*, 242 F.Supp.2d 1123, 1140 (M.D.Ala. 2003) (granting summary judgment to defendant on the ground plaintiff failed that show that similarly situated employees received greater job benefits than plaintiff). In sum, the court is aware of no evidence in the record before it that any plaintiff suffered an adverse action in the form of actually being denied overtime to which he was entitled or qualified to earn or that the City paid similarly situated employees overtime while it denied overtime to him.  Accordingly, none of the plaintiffs is able to establish a *prima facie* claim of disparate treatment in connection with overtime pay.

To the extent the complaint alleges that Glover was unfairly stripped of forty-two

hours of leave, the evidence reflects the following.  In 2003-04 the City had a policy of limiting leave accrual to a maximum of 780 hours.  If an employee's leave balance exceeded the 780 hour cap the balance would be reduced to the cap on the first of January each year.  At the end of 2003 Glover's balance exceeded the cap by forty-two hours and thus his leave balance was adjusted according to the City's policy.  According to the affidavit of Mary Stalcup, the City's human resources director, no employee was permitted to exceed the cap during the 2003 calendar year in question.  In his deposition Glover states that David Allen ("Allen"), a white captain in the Fire Department, was permitted to keep his excess leave while Glover was not.  With the exception of this allegation, however, which is unacceptably vague as to the time or circumstances involved, Glover has provided no specifics regarding his complaint of unequal treatment in connection with his excess leave.  Glover could not identify the amount of leave he alleges Allen was permitted to maintain or  what year this may have occurred; there also is no evidence indicating that the City had a policy limiting the amount of accrued leave that could be rolled over when Allen allegedly was permitted to keep his leave.  Absent evidence that the City treated a similarly situated individual more favorably under the 2003-04 accrued leave policy than it treated him, Glover cannot make out a *prima facie* claim of disparate treatment.  Similarly, Glover cannot establish a *prima facie* claim of disparate treatment with respect to his assertions that Dixon unfairly gave him a verbal reprimand regarding his job performance as facilities management captain (when, allegedly, Glover performed 800 yearly inspections compared to Allen's 200) or gave him an unfavorable job evaluation.  There is no summary judgment evidence which suggests that Dixon's verbal reprimand effected a serious and material change in the terms of Glover's employment.  As to the job performance evaluation, the City's evidence reflects that Dixon—rather than Glover's immediate supervisor—evaluated Glover in 2004 because the supervisor was away on military leave.  In any event, Dixon's evaluation was never placed in Glover's personnel file and it did not adversely affect Glover's wage increases or opportunities for promotion.  A letter Dixon wrote to Glover in 2005 cautioning him for failing to file a formal report regarding a personnel matter likewise was never placed in Glover's personnel file and thus likewise had no effect on the terms of his employment.

Plaintiffs also complain that they have been required to perform menial tasks around the station houses, while being supervised by less senior white employees, and that they

have received little or no recognition when they have earned promotions or awards. These allegations merit little discussion. First, the court does not believe they rise to the level of adverse employment actions as they do not effect a serious and material change in the conditions of employment. Second, even if the allegations were sufficient to be deemed adverse employment actions, other employees were not treated more favorably than plaintiffs. As Harris explains in his affidavit, he and other white employees routinely perform maintenance duties around the station houses, including pulling weeds and picking up cigarette butts. Additionally, Harris states that his promotion to captain was also without any ceremony, as his chief simply tossed his promotion pins to him with the comment that he needed more education but would be promoted regardless. Nor, in Harris' memory, were there formal promotion ceremonies for lieutenants and captains prior to 2008. To the extent they are not time-barred, plaintiffs' allegations therefore do not establish a *prima facie* claim of disparate treatment. Finally, any claim by Johnson (the only plaintiff who appears to assert it) that, unlike white employees, he has not been reimbursed for training expenses is untimely. As did the other plaintiffs, Johnson attended a five-year executive development program. Johnson, who attended the program from 1998 through 2003, testified that he paid all of the first year's expenses himself and part of the second year's as well. A complaint that his expenses went unpaid for 1998 and 1999 in whole or part is untimely. Only the alleged failure to reimburse expenses for 2001 or after might arguably be timely and therefore potentially actionable, but those expenses, according to Johnson, were paid in full by the City.

In summary, with the exception of the issue of whether the City unlawfully failed to promote Streeter to lieutenant from the March 2003-September 2004 promotion eligibility list, the City is entitled to summary judgment on plaintiffs' disparate treatment claims.

<u>Retaliation</u>

Plaintiffs allege they suffered retaliation after they complained to the City of racial discrimination in connection with promotions, racial slurs, training, overtime, and leave, and filed their charges of discrimination with the EEOC and/or FCHR.[35] According to the

---

[35] To the extent plaintiffs intend to allege an equal protection claim of retaliation, the Eleventh Circuit has indicated that although retaliation claims may be brought under the First Amendment or Title VII, they are not proper under the equal protection clause. *Ratliff v. DeKalb County, Ga.*, 62 F.3d 338, 340-41 (11th Cir. 1995) (stating that "[t]he right to be free from retaliation is clearly established as a first amendment right and as a statutory right under Title VII; but no clearly established right exists under the equal protection clause to

complaint, the retaliatory conduct included the unfavorable performance evaluation of Glover in February 2004, which Dixon prepared although he was not Glover's direct supervisor; Dixon's unfair written reprimand of Glover in 2005[36]; extending the March 2003 lieutenants' eligibility list for six months, which adversely affected Streeter and Cobbs, while extending the December 2002 captains' list for twelve months to the advantage of white firefighters; denying Johnson the overtime he requested; letting the promotion lists on which Cobbs and Streeter were certified expire without promoting them; and failing to promote Glover to chief when Dixon retired in August 2006.  The City moves for summary judgment on these claims, asserting that plaintiffs cannot show they suffered any adverse employment actions and, even if they could, they can establish no causal connection between any protected activity and the alleged adverse action.

Title VII prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing [thereunder]." 42 U.S.C. § 2000e-3(a).  A *prima facie* case of retaliation under Title VII requires the plaintiff to show that: (1) he engaged in an activity protected under Title VII; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).  In *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), the Supreme Court redefined the standard for retaliation claims under Title VII.  Previously, the type of employer conduct considered actionable included only that which adversely effected the plaintiff's conditions of employment or employment status; under the holding of *Burlington*, the adverse employment action standard has been broadened to include conduct that has a materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace-related. *See Burlington*, 126 S.Ct. at 2415; *see Crawford v. Carroll*, 529 F.3d

---

be free from retaliation."); *see also Bernheim v. Litt*, 79 F.3d 318, 323 (2nd Cir. 1996) (no court has recognized a claim for retaliation under equal protection clause following complaints of racial discrimination).  Thus the court concludes that no cause of action exists for retaliation under the equal protection clause of the Fourteenth Amendment.

[36]  The complaint in fact alleges that this action, which is not further described, occurred in 2003-2004.  The court assumes that the allegations involve the cautionary letter Dixon wrote but did not place in Glover's file, which Glover testified occurred in 2005.

961, 973 (11th Cir. 2008).  The Court additionally explained that in the context of a Title VII retaliation claim, a materially adverse action "means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*.  This is a more liberal view of what constitutes an adverse employment action, and accordingly grants an employee protection from a wider range of retaliatory conduct, than the Eleventh Circuit has recognized in the past under the "serious and material change in the terms, conditions, or privileges of employment" standard.  *Davis*, 245 F.3d at 1239; s*ee Crawford*, 529 F.3d at 974 (citing *Stavropoulos v. Firestone*, 361 F.3d 610, 616-17 (11th Cir. 2004), and *Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000)).  The third element of a Title VII retaliation claim, which requires a causal connection between the protected activity and the adverse employment action, "is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Pennington*, 261 F.3d at 1266 (quotation omitted). Generally, "close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact about a causal connection." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000); *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).   To satisfy this showing a plaintiff must also establish "the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *McCann*, 526 F.3d at 1376.

As discussed above, the evidence reflects that plaintiffs' belief that the City extended the lieutenants' eligibility list for six months while extending the captains' list for twelve months simply is incorrect.  Each list was extended for six months, and by the Board rather than by the City.  Thus no inference may be made from these facts that the City caused Streeter or Cobbs to suffer a materially adverse employment action.[37]   As previously discussed, however, for purposes of his discrimination claim Streeter has adequately established that he suffered an adverse employment action in connection with his nonpromotion to lieutenant from the March 2003-September 2004 eligibility list.  Given the more lenient standard for retaliation claims under Title VII, the court concludes Streeter has also shown he suffered a materially adverse employment action for purposes of his

---

[37]  Morever, the evidence shows that Cobbs in fact was promoted from the March 2003-September 2004 lieutenants' promotion list.

retaliation claim.  Being denied the opportunity for promotion might dissuade a reasonable worker from engaging in protected activity. *See Burlington*, 26 S.Ct. at 2415.  Furthermore, based on the April 19, 2004, filing of Streeter's charge of discrimination against the City and his failure to be promoted from the March 2003-September 2004 list (while a white candidate was promoted April 26, 2004) it appears that, temporally, a causal connection can be shown between the protected activity and adverse action. *See Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (holding that a seven-week gap is sufficiently close to establish a causal connection).  The court, therefore, concludes that Streeter has satisfied his burden of establishing a *prima facie* claim of retaliation.  As with Streeter's failure to promote claim, the City's arguments do not proceed beyond this point, *i.e.,* it failed to articulate any legitimate reasons it may have had for its actions.  Thus the City has not met its burden on the issue of whether it retaliated against Streeter when it failed to promote him to lieutenant from the March 2003-September 2004 promotion list.

Next, the court concludes that Johnson's being denied the overtime he requested in connection with servicing the SCOTT Airpaks, which does not constitute an adverse employment action for purposes of a discrimination claim, also does not satisfy the less demanding "materially adverse" standard.  There is no basis to conclude that a reasonable worker might be dissuaded from making or supporting a charge of discrimination because he failed to pursue and pay for training that would entitle him to receive overtime pay.  Moreover, even assuming Johnson has shown that he suffered a materially adverse employment action, he faces a time-bar with respect to any claim arising from events that occurred prior to at least March 2003: a claim based on complaints of discrimination Johnson made to the City when he was a firefighter (prior to 1995) or as a lieutenant (in 1996 in connection with a Ku Klux Klan incident) are untimely.  With respect to events occurring during the statutory period, the court is unaware of evidence of any alleged causal link between the charges of discrimination Johnson filed in June 2004 (or any other complaints he may have raised) and the fact he has not attended the desired training.  Rather, given the apparently sporadic nature of the requests over the length of time involved, the court concludes Johnson has failed to show a viable temporal connection between any protected activities in which he may have engaged and the alleged lack of training opportunities. *See Thomas*, 506 F.3d at 1364 (finding that a "three to four month disparity between the statutorily protected expression and the adverse employment action"

did not establish the required causal link); *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) (holding that three months between a protected activity and an adverse employment action standing alone was insufficient to establish a causal connection of retaliatory discharge); *Webb-Edwards v. Orange County Sheriff's Office*, 525 F.3d 1013, 1029 (11th Cir. 2008) (holding that an almost six-month gap between a complaint and a failure to transfer was insufficient to establish a causal connection).  Moreover, in light of the absence of "a close temporal relationship," Johnson has not produced sufficient alternative evidence showing that his protected activity and the employment actions were "not wholly unrelated." *See Gupta*, 212 F.3d at 590.

As previously noted, for purposes of Glover's discrimination claim the court has concluded that Dixon's written reprimand and unfavorable performance evaluation of Glover are insufficient to constitute serious and material changes in the terms of employment and thus are not adverse employment actions.  Nevertheless, applying the more liberal standard for retaliation claims than is used for discrimination claims, the court is persuaded that the reprimand and evaluation may be described as actions that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 26 S.Ct. at 2415. Accordingly, this conduct is cognizable as a materially adverse employment action for purposes of a Title VII retaliation claim. Additionally, Glover's nonselection as interim chief may constitute a materially adverse employment action because it involved the loss of additional pay.[38]

The court has not been directed to or located any evidence of record showing that, for purposes of his retaliation claim, any protected activities in which Glover may have engaged were temporally linked to his unfavorable evaluation in February 2004, reprimand in 2005, or nonpromotion to interim chief in August 2006.  Glover signed his FCHR charge of discrimination in March 2004, but the alleged retaliatory act involving the evaluation occurred the month prior.  As such, it could not be retaliation for Glover's engaging in

---

[38]  According to the City, it is longstanding Fire Department practice to allow an employee serving in a lower rank to take on the duties of a position at the next higher rank in an "acting" capacity on an interim basis. This temporary service does not require that lower ranking individual be fully qualified for the position, and it does not constitute a promotion.  The individual is, however, entitled to receive additional pay for his services.  At the time of Dixon's retirement in 2006 there were two deputy chiefs.  Waters was one of those deputy chiefs, and he rather than the other deputy chief or Glover (who says he too was minimally qualified for the interim job) was tapped to assume temporarily the responsibilities of acting fire chief.

protected activity.[39]  *McCann*, 526 F.3d at 1376.  Additionally, a period ranging from ten months to in excess of two years—from the time Glover filed his discrimination charge in March 2004 until, respectively, Dixon wrote the cautionary letter sometime in 2005 and Glover was not promoted to acting chief in August 2006—is too attenuated to establish the required causal link. *See Thomas*, 506 F.3d at 1364; *Drago,* 453 F.3d at 1308; *Webb-Edwards*, 525 F.3d at 1029.  Given the lack of evidence of "a close temporal relationship" and Glover's failure to come forward with other evidence showing that his protected activity and the employment actions were "not wholly unrelated," *see Gupta*, 212 F.3d at 590, Glover has not made out a *prima facie* claim of retaliation.

In summary, with the exception of the issue of whether the City retaliated against Streeter when it failed to promote him to lieutenant from the March 2003-September 2004 promotion eligibility list, the City is entitled to summary judgment on plaintiffs' retaliation claims.

### Glover's FMLA Claim

Glover alleges that the City violated the FMLA when it refused to grant him leave to attend his father prior to his death from cancer on January 30, 2003.  The City moves for summary judgment on this claim on the ground there is no evidence Glover requested leave pursuant to the FMLA or that the City denied such leave.

The FMLA "entitles an eligible employee to take up to 12 weeks of leave in a 12-month period for . . . the serious health condition of the employee or the employee's child, spouse, or parent." *Morrison v. Amway Corp.*, 323 F.3d 920, 922-23 (11th Cir. 2003) (citing 29 U.S.C. § 2612(a)(1)). An "eligible employee" is one who has been employed for at least twelve months by the employer and for at least 1250 hours of service with the employer during the previous twelve-month period. 29 U.S.C. § 2611(2)(A). The FMLA creates a private right of action to seek equitable relief and money damages against employers who "interfere with, restrain, or deny the exercise of or the attempt to exercise" FMLA rights. 29 U.S.C. §§ 2615(a)(1), 2617(a); *see Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 724-25, 123 S.Ct. 1972, 1976, 155 L.Ed.2d 953 (2003).  Section 2615(a) permits an aggrieved employee to bring an "interference claim[ ], in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under

---

[39]  To the extent Glover vaguely complains that he received a reprimand in 2003 or 2004,  this act also appears to predate the filing of his charge of discrimination and thus could not have been retaliatory.

the Act . . . ."[40]  *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006) (citing *Strickland v. Water Works and Sewer Bd. of the City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001)).  To establish an interference claim, "an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." *Strickland*, 239 F.3d at 1207.

It is undisputed that Glover is an "eligible employee" under the FMLA and that his father suffered a serious health condition.  Thus Glover has shown that he was entitled to take up to twelve weeks of leave under the FMLA.  Stalcup testified in an affidavit, however, that at no time from 2003 to the present has Glover submitted a FMLA request.  Thus, as the City contends, it did not deny any FMLA leave request made by Glover because none was submitted.  Moreover, according to Stalcup, in 2003 Glover was granted all of the leave he requested, which included seventeen days of annual leave.  Because Glover has failed to show that a genuine issue of fact exists as to whether he was denied a benefit under the FMLA to which he was entitled, the City is due to be granted summary judgment on Glover's FMLA claim.

**Conclusion**

For all of the foregoing reasons, the court finds that the City is entitled to summary judgment on plaintiffs' claims of a hostile work environment (Counts I and III) and Glover's FMLA claim (Count VIII).  Additionally, the City is entitled to summary judgment on plaintiffs' claims of disparate treatment  (Counts II and IV); retaliation (Counts VI and VII); and denial of equal protection (Count V), with the exception of Streeter's failure to promote and retaliation claims pertaining to the March 2003-September 2004 lieutenants' promotion eligibility list.

Accordingly, it is ORDERED:

1.    Plaintiffs' three "Consented Motion[s] for Leave to File Response Opposing Affidavits Submitted by Defendant on September 19, 2008" (docs. 127, 128, and 130), are DENIED.

2.    Plaintiffs' motion for leave to file a reply (doc. 132) is DENIED.

3.    The City's motion for summary judgment (doc. 106) is GRANTED in part and DENIED in part, as follows:

---

[40]    A second type of § 2615(a) claim, which is not at issue in this case, pertains to allegations of retaliation.

Case No. 3:05cv286/MCR

     a.     The City's motion for summary judgment on plaintiffs' claims of a hostile work environment (Counts I and III) and Glover's FMLA claim (Count VIII) is GRANTED.

     b.     The City's motion for summary judgment on plaintiffs' disparate treatment, retaliation, and equal protection claims (Counts II, IV, V, VI, and VII) is also GRANTED, except that as to Streeter's failure to promote and retaliation claims pertaining to the March 2003-September 2004 lieutenants' promotion eligibility list, the motion is DENIED.

     DONE and ORDERED this 2nd day of February, 2009.

          s/ *M. Casey Rodgers*
          **M. CASEY RODGERS**
          **UNITED STATES DISTRICT JUDGE**